IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

GOLDFISH SHIPPING, S.A.           CIVIL ACTION

**FILED**

v.

NOV 3 _ 2008

HSH NORDBANK AG          MICHAEL E. KUNZ, Clerk          NO. 07-3518
                         By_____ Dep. Clerk

MEMORANDUM                                November 3, 2008

**Padova, J.**

In this admiralty action, Plaintiff Goldfish Shipping, S.A. ("Goldfish") asserts multiple claims against Defendant HSH Nordbank AG ("Nordbank"), all of which arise out of the judicial mortgage foreclosure sale of a maritime vessel for which Nordbank was the mortgagee and Goldfish was the high bidder at auction. Presently before the Court is Nordbank's Motion to Dismiss. For the following reasons, we grant the Motion in its entirety and dismiss Goldfish's Amended Complaint (the "Complaint").

I.      BACKGROUND

On June 6, 2003, the M/V Ahmetbey ("the vessel") docked in the Port of Philadelphia. (Compl. ¶ 8.) That same day, Nordbank, which had a first mortgage on the vessel, initiated foreclosure proceedings against the mortgagor, a Turkish corporation called Odin Denizcilik, A.S. ("Odin"), asserting that Odin was in default on the mortgage (the "Foreclosure Action"). (Id. ¶ 10.) On October 6, 2003, after a trial, we issued findings of fact, conclusions of law, and an Order, finding in favor of Nordbank and ordering the vessel sold to satisfy the mortgage. (Id. ¶ 11.) Thereafter, the Marshal held a foreclosure sale and Goldfish was the high bidder for a price of $2,350,000. (Id. ¶ 12.) Nordbank filed a Motion for Confirmation of the Sale, asking for confirmation, and stating that the "'Court should confirm the sale of the vessel to [Goldfish] and direct the Marshal to issue a Bill of Sale to [Goldfish] free and clear of all liens and encumbrances.'"

(Id. ¶¶ 13-14 (quoting Affid. in Supp. of Mot. for Confirm., attached as Ex. 2 to Compl.).)  On November 14, 2003, we confirmed the sale and issued the requested order, which required the U.S. Marshal to transfer title of the vessel to Goldfish "free and clear of all claims, liens, or encumbrances in favor of any other person or entities which may have claimed an interest or a lien on the vessel." (Id. ¶ 15; 11/14/03 Order, attached as Ex. 2 to Compl.)  A bill of sale dated November 17, 2003 was provided to Goldfish upon its payment of the balance of the purchase price.  (Compl. ¶ 16.)

At the time of the vessel's arrest, the vessel flew the Turkish flag and appeared on the Turkish Registry of Shipping, which showed Odin to be the owner of the vessel. (Compl. ¶ 9.) The Complaint alleges that as between Goldfish and Nordbank, only Nordbank was authorized to delete the vessel from the Turkish Registry in order to foreclose Odin from challenging the sale, and it did not do so.  (Id. ¶¶ 19-20, 37.)  Nordbank had this authority pursuant to the mortgage, which appointed Nordbank as Odin's attorney and provided that Nordbank may "'do all acts which [Odin] itself could do in relation to the vessel.'"  (Id. ¶ 21 (quoting Mortg. Agrmt., attached as Ex. 5 to Compl.))

On December 10, 2003, Odin wrote to Goldfish claiming that the sale had been by way of an illegal auction and that it continued to own the vessel, because under Turkish law, the Ship could not be sold by public auction outside the Turkish jurisdiction.[1]  (Id. ¶ 26 (citing 12/10/03 Ltr.,

---

[1]Shortly thereafter, Goldfish notified us that Odin continued to claim ownership of the vessel, and that a company related to Odin had filed a lien in Turkey against the vessel. See HSH Nordbank v. M/V Ahmetbey, Civ. A. No. 03-3530, 2004 WL 359977, at *6 (E.D. Pa. Jan. 30, 2004). As a result, we stated in an opinion dated January 30, 2004: "Given that claims against the [vessel] still remain, the Court declines to order final distribution until these claims have been resolved and the ownership of the [vessel] has been transferred on the Turkish Registry." Id. We explained: "On November 14, 2003, the Court ordered the vessel sold free and clear of all liens and encumbrances, and it is clear to the Court that this outcome has not yet occurred, in that there are still title encumbrances on the [vessel]." Id. Our accompanying Order stated that we would retain the balance

attached as Ex. 7 to Compl.).)  Odin further wrote that it would arrest the vessel when given the opportunity. (Id.) Goldfish alleges, upon information and belief, that Odin had informed Nordbank of its claim that the judicial sale was "illegal" before the auction, and had further informed Nordbank that it intended to contest the sale on the grounds that the vessel appeared on the Turkish Registry of Shipping. (Id. ¶¶ 27, 29.) In support of this assertion, Goldfish alleges that Odin ran an October 16, 2003 classified advertisement in Lloyd's List, of which Nordbank was aware, stating that "'any party who purchases the vessel on auction of 22nd October 2003 without obtaining owners' authorization can never obtain a deletion certificate and can never actually own the vessel. The vessel will remain registered in the Istanbul Ship's Registrar books.'" (Id. ¶¶ 29-30 (quoting 10/16/03 Advertisement, attached as Ex. 9 to Compl.).) The Complaint also alleges that Nordbank failed to disclose Odin's intentions to Goldfish, in order to extract a higher purchase price at auction. (Id. ¶¶ 31-32.)

On or about March 10, 2004, Odin caused the vessel to be arrested in Barcelona, asserting in the arrest papers that it remained the owner of the vessel, because the sale had been illegal under Turkish law. (Id. ¶ 39.) On March 23, 2004, Goldfish arranged for the release of the vessel, but it had to substitute a bond in the amount of 239,805.55 Euros ($2,931,268.10 at the then-prevailing exchange rate).  (Id. ¶ 40.)  Moreover, as a result of the arrest, Goldfish suffered a loss of $581,048.34, consisting of the cost of detention while under arrest, bunker consumption during the period of arrest, additional port charges incurred, and losses on a subsequent charter that was

---

of the proceeds "until such time as all clouds and encumbrances upon the [vessel's] title are removed" and that, pursuant to our "inherent power to enforce [our] own orders," we would "conduct a final distribution of the proceeds from the sale of the [vessel] only after a showing of quieted title." Id. at *7.

3

canceled as a result of the arrest.  (Id. ¶ 41.)

On March 23, 2004, Goldfish commenced a separate proceeding against Odin in this Court (the "Goldfish Action"), seeking damages associated with the March 10, 2004 arrest, and it obtained an October 25, 2004 default judgment against Odin for $669,591.12 plus interest. (Compl. ¶¶ 42-44.)

On April 22, 2004, Nordbank suggested that Goldfish appear in Turkey and seek a declaration that it had obtained title to the vessel free and clear of liens and encumbrances. (Id. ¶ 17.) Goldfish subsequently asked Nordbank to issue an "unconditional [letter of] consent to the deletion of the vessel from the Turkish Registry." (Id. ¶ 23.) Nordbank responded by sending an April 30, 2004 letter to the Turkish Registry, stating: "As registered mortgagee of the vessel we hereby consent to the deletion of the vessel as a consequence of the fact that the vessel has lost its right to fly the Turkish flag.  The mortgages registered in our favour, however, are not yet satisfied and as such cannot be discharged, the purchase price of the vessel not having been distributed to the parties entitled thereto." (Compl. ¶ 23 (citing 4/30/04 Ltr., attached as Ex. 6 to Compl.).) According to the Complaint, this conditional consent blocked the deletion of the vessel from the Turkish Registry. (Id. ¶ 25.)

The Complaint alleges that Nordbank's failure to delete the vessel from the Turkish Registry of Shipping also resulted in Odin having the vessel arrested in Ravenna, Italy on June 4, 2004. (Id. ¶ 47.) That arrest, which was lifted on June 15, 2004, caused Goldfish to incur damages exceeding $500,000. (Id.)

On December 22, 2004, we issued a Consent Order in the Foreclosure Action, pursuant to which Goldfish collected $327,546.82 from the proceeds from the sale of the vessel to compensate

for losses sustained as a consequence of Odin's March 10, 2004 arrest of the vessel in Barcelona. (Id. ¶ 44.) The bulk of the balance of the sale proceeds ($608,301.35) was distributed to Nordbank. (Id. ¶ 45.)

The Complaint alleges that, in addition to the damages detailed above, Nordbank's failure to delete the Ship from the Turkish Registry resulted in Goldfish sustaining other losses in connection with both the Barcelona and Ravenna arrests, including legal fees in the amount of $160,000, and the $25,000 cost to change the vessel's name to preclude further arrests. (Id. ¶ 48.) Finally, Goldfish seeks to recover the $60,130 premium it paid for the bond it put up to secure the release of the vessel in Barcelona, which was in place from March 23, 2004 through March 23, 2007. (Id. ¶ 46.) In total, Goldfish asserts that it has sustained losses in excess of $1,000,0000. (Id. ¶ 47.)

The Complaint, which was filed on August 24, 2007, asserts nine claims against Nordbank: (1) Unjust Enrichment, (2) Promissory Estoppel, (3) Misrepresentation, (4) Fraud/Fraud in the Inducement, (5) Breach of Warranty, (6) Breach of Implied Warranty, (7) Contract Implied in Fact, (8) Contract Implied in Law, and (9) Breach of the Implied Covenant of Good Faith and Fair Dealing. Goldfish's essential complaint is that Nordbank is liable for failing to deliver a vessel "free and clear of all liens and encumbrances," because it never deleted the vessel from the Turkish Registry of Shipping.   Nordbank has filed a Motion to Dismiss all nine Counts of the Complaint. We held oral argument on the Motion on October 6, 2008, and now grant Nordbank's Motion.

## II.   LEGAL STANDARD

When considering a motion to dismiss pursuant to Rule 12(b)(6), we take the factual allegations of the complaint as true and draw all reasonable inferences in favor of the plaintiff. Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008) (citing Pinker v. Roche Holdings

Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002)).  We need not, however, "credit a complaint's bald assertions or legal conclusions." Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997).  A plaintiff's pleading obligation is to set forth "a short and plain statement of the claim," Fed. R. Civ. P. 8(a)(2), which gives the defendant "'fair notice of what the . . . claim is and the grounds upon which it rests.'" Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1964 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)).  While the complaint's factual allegations need not be detailed, the grounds upon which the claims rest must be "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Id. at 1964-65 (citation omitted).  The allegations of the complaint must "'plausibly suggest[ ]' that the pleader is entitled to relief." Sovereign Bank v. B.J.'s Wholesale Club, Inc., 533 F.3d  162, 173 n.7 (3d Cir. 2008) (quoting Twombly, 127 U.S. at 1966).  In the end, we will grant the 12(b)(6) motion if the factual allegations in the complaint are not sufficient "to raise a right to relief above the speculative level." Twombly, 127 S. Ct. at 1965 (citing 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235-236 (3d ed. 2004)).

III.    DISCUSSION

Nordbank makes a variety of arguments in support of its Motion to Dismiss.  Its primary argument is that all of Goldfish's claims fail because they are based on a factual premise that the vessel was not sold free and clear of Odin's claims against the vessel when, in fact, the vessel was sold in a judicial sale *in rem* under the Ship Mortgage Act, 46 U.S.C. §§ 31303, et seq., which, by its terms, dictates that the vessel was sold free and clear of all claims. Id. § 31326.  Secondarily, it argues, among other things, that (1) Goldfish's claims are barred by judicial estoppel, equitable estoppel, res judicata, and/or collateral estoppel; (2) the contract and warranty claims fail because

there are no allegations that, if proven, would establish a contract or warranty between Goldfish and Nordbank, either implied or otherwise; (3) the claims of promissory estoppel, misrepresentation and fraud fail because the Complaint contains no allegations of any representations or promises that Nordbank made to Goldfish; and (4) Goldfish cannot establish that any action by Nordbank was the proximate cause of its damages, because on the face of the Complaint, it is clear that Odin's intervening activities were a superceding cause of the damages.

For the following reasons, we find that all nine of Goldfish's claims fail because they rely on the premise that the title it received in the foreclosure sale of the vessel under the Ship Mortgage Act was not free and clear of all liens, claims and encumbrances when, in fact, the legal result of a sale under the Act is the conveyance of a title that is good against the world. Moreover, as explained below, for a variety of other reasons, even in the absence of the Ship Mortgage Act, we would dismiss all nine counts of the Complaint for failure to state claims on which relief may be granted.

A. The Ship Mortgage Act

Under the Ship Mortgage Act, the holder of a preferred mortgage on a maritime vessel that is in default may enforce the terms of that mortgage by bringing an action against the vessel *in rem* and an action against the owner *in personam*. 46 U.S.C. § 31325(b). In the *in rem* action, the mortgagee names the vessel itself as a defendant, and the vessel is seized and sold in a judicial sale. The proceeds of the sale, the "res," are deposited with the court and used to compensate the preferred mortgage holder and other creditors, with the preferred mortgage holder having priority over the claims of other creditors. 46 U.S.C. § 31326(b).

Specifically, the Ship Mortgage Act (the "Act") provides as follows:

When a vessel is sold by order of a district court in a civil action in

7

> rem brought to enforce a preferred mortgage lien or a maritime lien,
> any claim in the vessel existing on the date of sale is terminated,
> including a possessory common law lien of which a person is
> deprived under section 31325(e)(2) of this title, and the vessel is sold
> free of all those claims.

46 U.S.C. § 31326(a).  The Act further provides that "[e]ach of the claims terminated under subsection (a) of this section attaches [to the proceeds of the sale], in the same amount and in accordance with their priorities to the proceeds of the sale . . . ."  Id. § 31326(b); see also Oil Shipping (Bunkering) B.V. v. Royal Bank of Scotland, 817 F. Supp. 1254, 1257-58 (E.D. Pa. 1993) ("[W]hen a vessel is sold at a judicial sale, all claims against the vessel are terminated and subsequently attach to the proceeds of the sale.").  As the United States Supreme Court has explained, "[t]he distinguishing and characteristic feature of an [action in rem in admiralty] is that the vessel . . . proceeded against is itself seized and impleaded as the defendant, and is judged and sentenced accordingly." The Moses Taylor, 71 U.S. 411, 427 (1866).  "It is this dominion of the suit in admiralty over the vessel . . . which gives the title made under its decrees validity against all the world." Id. (emphasis added); see also Oil Shipping (Bunkering) B.V. v. Sonmez Denizcilik Ve Ticaret A.S., 10 F.3d 1015, 1022 (3d Cir. 1993) (noting that the Act provides "an expeditious procedure by which a United States court sitting in admiralty may foreclose on ship mortgage on a foreign-flag vessel and give title good against the world to the new purchaser.") (emphasis added) (citing H.R. Rep. No. 1662, 83d Cong., 2d Sess. reprinted in 1954 U.S.C.C.A.N. at 2452 ); see also Isbandtsen Marine Servs., Inc., 93 F.3d 728, 733 (11th Cir. 1996) (noting that it appears correct that a purchaser of a vessel in an in rem proceeding "gain[s] good title against the world") (citing Schoenbaum, Admiralty and Maritime Law 514 (2d ed. 1994 & Supp. 1995)).

In the instant case, it is undisputed that the vessel was sold in an in rem proceeding under the

Act and, thus, we find that, pursuant to the Act, all "claim[s] in the vessel existing on the date of sale" were terminated and statutorily converted to claims against the *res*. 46 U.S.C. § 31326(a), (b). Goldfish nevertheless maintains that the vessel was not sold "free and clear" of Odin's claim to title of the vessel. Essentially, it asserts that the statute only terminates liens, which arise out of debts or monetary obligations that the vessel has incurred. It contends that Odin's claim to title is not a claim to enforce a debt or monetary obligation of the vessel and, thus, his claim falls outside the scope of the statute and is not terminated by the judicial sale.

However, this argument, for which Goldfish cites no pertinent legal authority, ignores the plain language of the statute. See Caminetti v. United States, 242 U.S. 470, 485 (1917) ("It is elementary that the meaning of a statute must, in the first instance, be sought in the language in which the act is framed, and if that is plain . . . the sole function of the courts is to enforce it according to its terms."). After specifically referencing preferred mortgage and maritime liens, the statute does not go on to say that all "preferred mortgage liens" and "maritime liens" are terminated but, rather, states that "all claim[s] in the vessel are terminated." 46 U.S.C. § 31326(a). When the legislature uses distinct terms, we presume it to have done so intentionally and that the terms have distinct meanings. See, e.g., Bailey v. United States, 516 U.S. 137, 146 (1995) (rejecting an interpretation of a criminal statute because "[n]othing here indicates that Congress, when it provided these two [different] terms, intended that they be understood to be redundant. We assume that Congress used two terms because it intended each term to have a particular, nonsuperfluous meaning."); see also Grant Gilmore & Charles L. Black, Jr., The Law of Admiralty § 9-20 (2d ed. 1975) (hereinafter, "Gilmore & Black") (distinguishing between claims and liens, and noting that only certain claims give rise to liens); see also id. at § 9-58 (discussing priority to proceeds and

explaining that "maritime claims outrank non-maritime claims . . . and . . . maritime lien claims outrank claims which are maritime but not liens . . . ."). Thus, we reject Goldfish's interpretation, which would require us to interpret "lien" and "claim" to be indistinguishable from one another.

Furthermore, we find that Odin's "claim" to title was a "claim" within the meaning of that term in the statute. Rule C(6) of the Supplemental Rules for Certain Admiralty Claims of the Federal Rules of Civil Procedure specifically provides that "a person who asserts a right of possession or any ownership interest in the property . . . must file a verified statement of right or interest . . . [that] describe[s] the interest in the property that supports the person's demand for its restitution or right to defend the action." Supp. Rule C(6)(I), (ii).  That "verified statement of right or interest" is, in common terms, a "claim." Indeed, in this very case, Odin filed a "Verified Claim of Owner . . . Pursuant to Supplemental Admiralty Rules C(6) and E(8)." (See Docket No. 10, HSH Nordbank v. M/V Ahmetbey, Civ. A. No. 03-3530 (E.D. Pa.).) That claim gave Odin the right to both challenge the arrest of the vessel and to share in any surplus proceeds from the sale after other liens and valid claims against the vessel were paid. See Gilmore & Black, § 9-85 ("The admiralty court will . . . turn over any remaining surplus to the owner."); id. at § 9-87 (stating that the proceeds of the in rem sale, "'if unaffected by any lien . . . become by operation of law the absolute property of the owner'" (quoting The Lottawana, 87 U.S. (20 Wall) 201, 223 (1873))).

Under these circumstances, we are unpersuaded by Goldfish's argument that Odin's claim of continued ownership is not a "claim" that was terminated against the vessel and transferred to the proceeds of the sale pursuant to the statute.[2]  Rather, we find that, as a matter of law, Odin's claim

---

[2]Goldfish suggested in its brief that such a conclusion would be inconsistent with prior conclusions we reached in our January 30, 2004 Opinion, in which we stated, among other things, that "claims against the [vessel] still remain," and that "there are still title encumbrances on the

of ownership to the vessel, and any interest he held in the title, was terminated against the vessel and transferred to the *res*, from which he could receive compensation for his lost interest if any surplus remained after payment of the vessel's creditors.[3]

Consequently, we find that all nine counts of the Complaint fail to state claims upon which relief may be granted, because all nine, by their own terms, rely on the predicate that the vessel was not sold "free of" Odin's claims. Count I, which asserts an unjust enrichment claim, alleges that Nordbank was unjustly enriched because it represented that the vessel "should be sold free and clear of all liens and encumbrances" and then the vessel was not sold "free and clear of all liens and encumbrances" because Odin continued to assert its rights to the vessel. (Compl. ¶¶ 49-54.) Count

---

[vessel]." See HSH Nordbank, 2004 WL 359977, at *6; see also n.2, supra. However, the language that we used in our January 30, 2004 Opinion was not intended to, and could not, contradict the plain language of the Ship Mortgage Act. We simply made these statements in recognition of the fact that Odin was continuing to assert frivolous claims of ownership to the vessel, which were causing complications for Goldfish. Critically, while we ultimately approved a consent order that permitted Goldfish to collect from the *res* for certain of its losses associated with Odin's misconduct, that solution was not dependent on any legal finding that the title that had passed to Goldfish was not free and clear title that was good against the world but, rather, was pursuant to an agreement among the parties, which reflected the reality that Odin was not recognizing our valid decree of free and clear title.

[3]Notably, it appears that even in the absence of the Act, general mortgage foreclosure law would dictate that all of the foreclosing mortgagor's interest in foreclosed-upon property passes on to the purchaser at a judicial foreclosure sale. See 59 CJS Mortgages § 554 (2008) ("[A] valid and completed foreclosure operates to divest the title to the mortgaged premises possessed by the mortgagor, to which the mortgage has attached, and to vest it . . . in . . . [a] third person purchasing at a foreclosure sale . . . in [a] judicial [foreclosure] proceeding . . . ."); Juniata Valley Bank v. Martin Oil Co., 736 A.2d 650, 660 (Pa. Super. Ct. 1999) ("[A] foreclosure purchaser steps into the shoes of the [mortgagor] and acquires . . . such rights in the property as possessed by the [mortgagor]."); id. ("[T]he purchaser at [a sheriff's sale] receives all the right, title, and interest in the property that the [mortgagor] held . . . .") (quoting CSS Corp. v. Sheriff of Chester County, 507 A.2d 870, 872 (Pa. Super. Ct. 1986)). Thus, even under more generally applicable law, all of Odin's rights to the vessel would have been transferred to Goldfish in the sale, thus extinguishing Odin's claim to title.

II, which asserts a claim of promissory estoppel, alleges that Nordbank, in moving to confirm the sale of the vessel, promised that the vessel would be sold "free and clear of all liens and encumbrances" and asks that Goldfish be placed "in the position it would have been in had [Nordbank], in fact, sold a vessel free and clear of all liens and encumbrances." (Id. ¶¶ 55-59.) Count III, the claim for misrepresentation, relies on the premise that Nordbank misrepresented that the vessel would be sold free and clear of all liens and encumbrances, when it was not. (Id. ¶¶ 56-64.) Count IV, the claim for Fraud/Fraud in the Inducement, alleges that Nordbank knew but failed to disclose that it could not deliver the vessel "free and clear." (Id. ¶¶ 65-70.) Counts V and VI, the breach of warranty and implied warranty claims, allege that Nordbank warranted, or impliedly warranted, that the vessel would be "free and clear of all liens and encumbrances,"and that this warranty was breached. (Id. ¶¶ 71-79.) Count VII and Count VIII, the breach of contract implied in fact and contract implied in law claims, allege that Nordbank contracted to provide a vessel "free and clear of all liens and encumbrances" and then did not do so. (Id. ¶¶ 80-87.) Finally, Count IX, the claim for breach of the implied covenant of good faith and fair dealing, also relies on the predicate that the vessel was not sold free and clear of all liens and encumbrances, because it essentially alleges that Nordbank acted in bad faith by failing to clear title to the vessel by deleting the vessel from the Turkish Registry. (Id. ¶¶ 88-93.)

   In sum, the Ship Mortgage Act, by its terms, provides that the vessel in this case was sold free of all claims, liens and encumbrances, which includes Odin's claim to title. Our November 14, 2003 Confirmation Order reiterated that fact, as we ordered the U.S. Marshal to transfer title of the vessel to Goldfish "free and clear of all claims, liens, or encumbrances in favor of any other person or entities which may have claimed an interest or a lien on the vessel . . . ." (Ex. 3 to Compl.) Thus,

12

all of Goldfish's claims, which hinge on the premise that the vessel was not sold "free and clear" of

Odin's claims, fail as a matter of law and we dismiss them on that basis.

B.  Individual Claims

Even assuming *arguendo* that Goldfish's claims did not fail to state claims upon which relief

may be granted for the above reason, we would dismiss all nine counts of the Complaint for other

reasons.

1.    Contract and Warranty

The breach of warranty and contract claims (Counts V-IX) fail to state claims upon which

relief may be granted for the simple reason that the Complaint fails to identify any valid contract or

warranty between the parties.[4]  Goldfish suggests in its brief in opposition to the motion to dismiss

that we should find that an implied contract was formed in the judicial sale of the vessel between

Nordbank as the seller and Goldfish as the buyer.  In the alternative, it argues that it was the intended

third-party beneficiary to the mortgage agreement between Nordbank and Odin and that the mortgage

agreement obligated Nordbank to ensure that it received free and clear title in the judicial sale.

Neither of these arguments have legal merit.

First, the implied contract argument fails for the simple reason that Nordbank was not the

_____

[4]We note that, under Pennsylvania law, there is no independent claim for breach of the implied covenant of good faith and fair dealing. Lyon Fin. Servs. v. Woodlake Imaging, LLC, No. 04-3334, 2005 WL 331695, at *8 (E.D. Pa. Feb. 9, 2005) (citations omitted).  Thus, a claim for a breach of the covenant of good faith and fair dealing is simply a breach of contract claim, for which the usual elements of a breach of contract claim must be pled.  See Temple Univ. Hosp. Inc. v. Group Health, Inc., Civ. A. No. 05-102, 2006 WL 146426, at *6 (E.D. Pa. Jan. 12, 2006) (citing McAllister v. Royal Caribbean Cruises, Ltd., Civ. A. No. 02-2393, 2003 WL 23192102, at *4 (E.D. Pa. Sept. 30, 2003)).  In other words, in order to survive a motion to dismiss on such a claim, the Plaintiffs must plead "(1) the existence of a contract, including its essential terms; (2) a breach of a duty imposed by the contract; and (3) resultant damages." Id. (quoting McAllister, 2003 WL 23192102, at *4).

seller of the vessel; it was merely the foreclosing creditor.  The record in this case, and the nature of *in rem* proceedings in general, makes clear that Marshal was the seller, and title to the vessel was transferred directly from Odin to Goldfish.[5]  Furthermore, Goldfish points to no case law in the maritime context in which the plaintiff in a foreclosure action, who prompted the United States Marshal to sell a vessel under the Ship Mortgage Act, has been found to be the "seller" of that vessel, such that a contract or warranty arises between the foreclosure action plaintiff and the buyer at the judicial sale.[6]  In the absence of any such authority, we will not find that the mere fact of the *in rem* sale somehow gave rise to a contractual relationship between Nordbank and Goldfish.  We therefore find that Goldfish cannot state cognizable contract claims against Nordbank based on such a theory.

---

[5]As Gilmore & Black explain in The Law of Admiralty:

> The maritime lienor is not a co-owner of the ship.  He has no right to
> control the ships use or movements in any way.  It remains the
> owner's ship for all purposes -- subject to the lienor's right to have it
> arrested, wherever he can find it, on process issuing from the
> admiralty court.

Gilmore & Black, § 9-3.

[6]Goldfish points to just one case  in which a breach of contract claim was brought against a seller in a judicial sale, and one case in which a breach of warranty claim was brought against a seller in a judicial sale.  The contract case, Sterling v. Blackwelder, 302 F. Supp. 1125 (E.D. Va. 1968), is not only outside the maritime context, because it involved the sale of land, and involved the application of Virginia state law, which has no applicability here, but, in addition, it involved a written contract of sale between the owner of the land and the buyer, and that contract of sale was merely confirmed by a special master.  Meanwhile, the warranty case, Nolen Motor Co. v. Stephenson, 147 So.2d 462 (La. App. 1963), involved a sheriff's sale of an automobile to satisfy a creditor's judgment against the automobile's owner.  The Nolen court permitted the buyer at the sheriff's sale to bring a breach of warranty claim against the creditor pursuant to Louisiana state statutes that specifically granted the purchaser a breach of warranty remedy against the seizing creditor, none of which are applicable here.  Id. at 463-64.  Accordingly, neither Sterling nor Nolen provide support for Goldfish's argument that it can now bring either claims for breach of warranty or contract against Nordbank solely on account of the respective roles of Goldfish and Nordbank in the judicial sale of the vessel.

14

We also find implausible Goldfish's second contract/warranty theory, i.e., that it was a third-party beneficiary to the Mortgage Agreement between Odin and Nordbank and, thus, can bring an action against Nordbank for breach of Nordbank's obligations under that agreement. Goldfish's allegations and arguments in this regard are so strained that they are difficult to follow.

The Complaint alleges that the Mortgage Agreement provides as follows:

> [U]pon any sale of the vessel . . . by the Mortgagee . . . the purchaser shall not be bound to see or enquire whether the Mortgagee's power of sale has arisen in the manner here provided and the sale shall be deemed to be within the power of the Mortgagee and the receipt of the Mortgagee for the purchase money shall effectively discharge the purchaser who shall not be concerned with the manner of application of the proceeds of sale or be in any way answerable for.

(Compl. ¶ 90 (citing Ex. 5 to Compl., at 16) (the "Purchaser Clause").) The Complaint further alleges that the Agreement provides that Odin "'hereby irrevocably appoints [Nordbank] as its attorney for the duration of the Security Period for the purpose of doing in its name all acts which the Owner itself could do in relation to the vessel.'" (Id. ¶ 91 (emphasis omitted) (quoting Ex. 5 to Compl., at 18).) According to Goldfish, these provisions obligated Nordbank to "do all acts which the Owner itself could do," which included deletion of the vessel from the Turkish Registry. (Id. ¶ 92.) Also according to Goldfish, this was an obligation that it was entitled to enforce because the mortgage provided that the purchaser's "receipt of the Mortgagee for the purchase money shall effectively discharge the purchaser who shall not be concerned with the manner of application of the proceeds of the sale or be in any way answerable for," making clear that the obligation was designed to benefit the purchaser of the vessel. (Goldfish Br. at 12.)

We reject as a matter of law Goldfish's assertion that the less-than-precise language on which it relies functioned to designate it an intended third-party beneficiary to the contract and entitled it

15

enforce some inherent promise by Nordbank to delete the vessel from the Turkish Registry.   There is no reasonable indication in this contractual language that the parties to the mortgage, i.e., Odin and Nordbank, had any intention of creating duties running from Nordbank to Goldfish in order to protect Goldfish's rights as a purchaser.   Moreover, we can discern no conceivable duty in the contract for Nordbank to delete the vessel from the Turkish Registry.  At the absolute best, Goldfish was a mere incidental beneficiary to the contract, and an incidental beneficiary has no right to enforce a contract.  Isbrandtsen Co. v. Local 1291, 204 F.2d 495, 498 (3d Cir. 1953).  No doubt recognizing that its third-party beneficiary argument has no genuine legal or factual basis, Goldfish does not cite to any law regarding third-party beneficiaries or attempt to conform its arguments to the framework of that law.  We therefore find Goldfish's claim to third-party beneficiary status to be patently implausible and insufficient to support a breach of contract or warranty claim.

For the foregoing reasons, we conclude that even if Goldfish's claims in this action could somehow survive the clear terms of the Ship Mortgage Act, Goldfish has failed to state a breach of contract or warranty claim upon which relief may be granted because it has not identified any relationship between the parties from which any contractual or warranty obligations could have arisen.

2.    Promissory Estoppel, Negligent Misrepresentation and Fraud/Fraudulent Inducement

The Counts of the Complaint that assert claims of promissory estoppel, negligent misrepresentation and fraud/fraudulent inducement (Counts II, III and IV) also fail to state claims upon which relief may be granted, primarily because the Complaint contains no allegations of any actual promise or misrepresentation.

In order to state a claim of promissory estoppel, a plaintiff must allege that (1) the promisor has made a promise that he should reasonably expect to induce action on the part of the promisee, (2) the promise actually induced such action, and (3) injustice can be avoided only by enforcement of the promise. Holewinski v. Children's Hosp. of Pittsburgh, 649 A.2d 712, 714 (Pa. Super. Ct. 1994). To state a claim for negligent misrepresentation, the plaintiff must allege (1) a misrepresentation of material fact; (2) made under circumstances in which the misrepresenter ought to have known its falsity; (3) with intent to induce another to act on it; and (4) which results in injury to the plaintiff, who acted in justifiable reliance on the misrepresentation. Bortz v. Noon, 729 A.2d 555, 561 (Pa. 1999) (citing Restatement (Second) of Torts § 552 (1977)). To state a claim for fraud, the plaintiff must plead: "(1) a specific false representation of material fact; (2) knowledge by the person who made it of its falsity; (3) ignorance of its falsity by the person to whom it was made; (4) the intention that it should be acted upon; and (5) that the plaintiff acted upon it to [its] damage." In re Suprema Specialties, Inc. Secs. Litig., 438 F.3d 256, 270 (3d Cir. 2006) (quoting Shapiro v. UJB Fin. Corp., 964 F.2d 272, 284 (3d Cir. 1992)). A claim for fraudulent inducement includes an additional element, that the misrepresentation was made with the specific intent to induce another to enter into a contract when the person had no duty to enter into the contract. In re Allegheny Int'l, Inc., 954 F.2d 167, 178 (3d Cir. 1992).

Here, the Complaint does not allege either a promise or a misrepresentation of material fact and, thus, it fails to state a claim under any of these theories. The Complaint repeatedly alleges that Nordbank represented in its motion to confirm the judicial sale of the vessel that the vessel "should be sold free and clear of all liens and encumbrances." (Compl. ¶¶ 56, 61, 68.) This is not a statement of fact that could give rise to a claim of negligent misrepresentation or fraud; it is merely

a request to the Court. Likewise, the Complaint does not allege that Nordbank ever made any actual promise to Goldfish; it simply alleges that Nordbank "<u>effectively</u> promised that the vessel was free and clear of all liens and encumbrances," based again on the mere fact that Nordbank, in its motion for confirmation, stated that the "the vessel <u>should be</u> sold free and clear of all liens and encumbrances." (Compl. ¶ 56) (emphases added.) As there is no promise inherent in this request, the promissory estoppel claim fails as well.

Finally, we recognize that Goldfish's fraud claim is partially based on allegations of omissions, i.e., that Nordbank "failed to disclose[] that Odin intended to contest the sale of the vessel by virtue of its appearing on the Turkish Registry of Shipping" and that it could not deliver the vessel "free and clear" as a result. (Compl. ¶ 66.) However, omissions can give rise to valid claims of fraud only when the defendant had a duty to disclose the omitted information. See Restatement (Second) of Torts § 551(2). The factual allegations of the Complaint do not identify a valid source of a duty of Nordbank to disclose Odin's litigious intentions, and Goldfish has not pointed us to any legal authority that establishes such a general duty between a foreclosing mortgagee and the purchaser at a judicial sale *in rem*. Thus, it has not stated a cognizable claim of fraud based on a failure to disclose.

As Goldfish's promissory estoppel, negligent misrepresentation, and fraud claims find no support in the allegations of the Complaint or in the law, they do not state claims upon which relief may be granted. Accordingly, even in the absence of § 31326(b) of the Ship Mortgage Act, we would dismiss these claims on this basis.

3.   <u>Unjust Enrichment</u>

The last Count in the Complaint (Count I), which asserts a claim of unjust enrichment, also

18

fails to state a claim upon which relief may be granted. To state a claim for unjust enrichment, a plaintiff must set forth the following elements: (1) benefits conferred on the defendant by the plaintiff; (2) appreciation of such benefits by the defendant; and (3) acceptance and retention of such benefits under circumstances under which it would be inequitable for the defendant to retain the benefit without payment of value. Allegheny Gen. Hosp. v. Philip Morris, Inc., 228 F.3d 429, 447 (3d Cir. 2000). The most significant requirement is that the enrichment to the defendant be unjust. Thompson v. Glenmede Trust Co., Civ. A. No. 92-5233, 1996 WL 635682, at *9 (E.D. Pa. Oct. 31, 1996) (citing Myers-Macomber Eng'rs v. M.L.W. Constr. Corp., 414 A.2d 357, 360 (Pa. Super. Ct. 1979)).

       In this case, the Complaint does not specifically allege how Nordbank was "enriched." That said, at oral argument, Goldfish suggested that the enrichment was that Nordbank was enriched through the satisfaction of its lien from the proceeds of the vessel's sale. (N.T. 10/6/08, at 45:12-21.) However, we cannot fathom how repayment of a valid lien, pursuant to statutory authority giving the lien preference over all others and statutory procedures for the enforcement of the lien, can possibly be labeled "unjust." Furthermore, the benefit Nordbank received from satisfaction of the lien was not a benefit that was conferred "without payment of value." Allegheny Gen. Hosp., 228 F.3d at 447. To the contrary, Nordbank extended credit to Odin by way of a mortgage, Odin defaulted, and Nordbank was contractually entitled to full repayment of the credit it had extended. Under these circumstances, Goldfish's suggestion that Nordbank's retention of this benefit was nonetheless "unjust" is simply implausible.[7] Consequently, even assuming for the sake of argument

       [7]We also note that after Nordbank had its lien satisfied from the proceeds of the sale, Goldfish, Odin, and Nordbank entered into a consent agreement, whereby the remainder of the res was distributed, with Nordbank receiving another $608,301.35. (Docket No. 21, Goldfish Shipping,

that the unjust enrichment claim could survive § 31326 of the Ship Mortgage Act, it would nevertheless fail under Rule 12(b)(6)'s "plausibility standard." Sovereign Bank, 533 F.3d at 173 n.7 (citing Twombly, 127 U.S. at 1966).

IV.    CONCLUSION

As explained at length above, we dismiss Goldfish's Complaint on legal principles alone. We nevertheless feel compelled to add that we also believe this result to be fair under the circumstances. We have been involved in litigation with these parties since 2003, when Nordbank first sought to have the vessel arrested. We entertained Odin's challenge to the arrest, both ordered and confirmed the Marshal's sale of the vessel in order to satisfy Nordbank's lien, ordered that the Marshal deliver title to the vessel to Goldfish "free and clear of all claims, liens, or encumbrances," and oversaw the distribution of the proceeds. We also entertained and resolved an action that Goldfish filed against Odin for damages it suffered on account of Odin's improper arrest of the vessel in Barcelona, and Goldfish subsequently received compensation for those damages from the proceeds of the *in rem* sale.

The instant matter is yet another action commenced by Goldfish, this time seeking to recover from Nordbank damages that it suffered on account of Odin's misconduct -- damages that it could have, but did not, seek to recover from the *res*. The action is based largely on Nordbank's alleged failure to delete the vessel from the Turkish Registry -- an alleged failure that predated the final distribution of the *res*, but which Goldfish never brought to our attention. Certainly, the much more appropriate time to litigate these issues was when Odin, Nordbank and Goldfish were all before the

---

S.A. v. Odin Denizcilik, Civ. A. No. 04-1251 (E.D. Pa.)). That Goldfish agreed to this additional distribution, and yet now alleges that the initial repayment of the lien "unjustly enriched" Nordbank defies logic and, thus, gives rise to an implausible claim.

bar of this Court and there was a ready pool of money awaiting distribution in the Court's registry. It simply flies in the face of judicial finality to now revisit both the validity of the title that passed to Goldfish in the *in rem* sale and Nordbank's obligations in connection with the sale.

In any event, these considerations aside, for the reasons set forth at length above, we conclude that Goldfish's claims fail as a matter of law and we therefore dismiss the Complaint and enter judgment in Nordbank's favor on that basis.[8]  An appropriate Order follows.

---

[8]Nordbank also asks in its Motion that we exercise our inherent powers in admiralty to order Goldfish to pay Nordbank's attorney's fees in this action, arguing that the action is "baseless, frivolous and vexatious." (Nordbank Br. at 49-51 (citing <u>Thypin Steel Co. v. Asoma Corp.</u>, 82 Fed. Appx. 738 (2d Cir. 2003)).  We are not convinced, however, that Goldfish initiated this action for any improper purpose and, therefore, deny Nordbank's request.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

GOLDFISH SHIPPING, S.A.              :          CIVIL ACTION
                                     :
        v.                           :
                                     :
HSH NORDBANK AG                      :          NO. 07-3518

**FILED**

NOV 3 . 2008

MICHAEL E. KUNZ, Clerk
By_____Dep. Clerk

## ORDER

**AND NOW**, this 3rd day of November, 2008, upon consideration of the Defendant HSH Nordbank AG's Motion to Dismiss (Docket No. 20), and Plaintiff Goldfish Shipping, S.A.'s response thereto, and all concomitant submissions, and after argument on October 6, 2008, **IT IS HEREBY ORDERED** that:

1.    The Motion is **GRANTED**.

2.    Plaintiff Goldfish Shipping, S.A.'s Amended Complaint is **DISMISSED**.

3.    **JUDGMENT IS ENTERED** in favor of Defendant HSH Nordbank AG and against Plaintiff Goldfish Shipping, S.A.

4.    HSH Nordbank A.G.'s request for attorney's fees and costs is **DENIED**.

BY THE COURT:

John R. Padova, J.